**Gail ALLRED, Appellee,**

v.

**Kevin SVARCZKOPF, Appellant.**

No. 76–1508.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 4, 1977.

Decided Jan. 20, 1978.

Robert M. McRae of Hatch, McRae & Richardson, Salt Lake City, Utah, for appellee.

Lynn W. Mitton & Mitton, Roosevelt, Utah, for appellant.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Kevin Svarczkopf (Kevin) appeals from a judgment entered by the district court awarding Appellee Gail Allred (Gail) general damages of $5,000.00 and punitive damages of $650.00 in an action brought to vindicate alleged violations of civil rights under 42 U.S.C.A. § 1983. Trial was to the court without a jury.

On August 22, 1975, at about 7:00 o'clock in the morning, Kevin, a recently appointed Animal Control Officer (hired by the chief of police) of Roosevelt City, Utah, whose population is about 4,000, was patrolling its streets in the vicinity of the Gail and Larry Joseph Allred residence. He parked his vehicle north of the residence just as Larry Joseph Allred departed the home and drove away in his car to work. The two men observed each other. Kevin had seen a black Labrador dog on the Allred's lawn adjacent to the front door of the residence when he drove up. Kevin testified that when he was hired, he had been instructed that he was to enforce the Roosevelt City ordinances on animal control, including the following ordinances then in force and effect:

Section 2–24. *Dogs at Large.*

It shall be unlawful for any person to suffer or allow any dog owned by him, in his possession or under his control to run at large within the corporate limits of Roosevelt City.

Section 2–25. *Impounding of Dog at Large.*

Any dog running at large within the corporate limits of Roosevelt City away from the premises of its owner and not secured by a leash or in the immediate possession and control of its owner may

**1148**

be impounded by the dog tax collector of Roosevelt City or any policeman.

Kevin approached and knocked on the front door of the Allred residence. Gail responded, dressed in her nightgown and robe. After inquiring about the dog in the yard, Kevin informed Gail that "it was in violation of a city ordinance inasmuch as it was allowed to run loose.

Kevin then informed Gail that he was going to cite her for allowing the dog to "run loose" in violation of the ordinance. She responded, "Okay." Kevin then requested that Gail provide him with some ID, such as her driver's license (for the purpose of completing her proper name on the citation form). Gail refused to provide Kevin with any identification. She testified that she ". . . couldn't see what my driver's license had to do with anything . . . He [Kevin] told me he needed some identification and I said, well I have to go to work at 8:00 o'clock" and that she didn't have time to produce her driver's license. Kevin then asked Gail for her proper name. She responded that he could "get it" off of a plaque on the side of the front door. The trial court volunteered an opinion and/or observation at this point, as follows:

THE COURT: Here she is in her home in the morning, still in her nightgown. He wants to see her ID, identification, what in the hell for?
[R., Vol. I, p. 27.]

Kevin did then obtain the name "Mrs. L. J. Allred" from the plaque which he wrote on the citation. Kevin then handed Gail a "citation" form which had been provided him by his superiors for use in such cases entitled "Complaint and Notice to Appear" which was admitted in evidence. The "citation" charged Gail with "Dog Loose" under a block entitled "Other" [offense] which Kevin had completed for Gail's appearance before the justice of the peace on August 27, 1977 [no specific time designated] which was, of course, two days hence. Gail refused to either read or sign the citation. She testified that she said ". . . no, I wasn't going to sign anything." [R., Vol. I,

p. 32.] Both Kevin and Gail agree that thereupon Kevin remarked that unless she signed the citation with its attendant "Promise to Appear" that he would have to arrest her and take her to jail. Kevin testified that he informed Gail that the citation form was not an admission of guilt but simply a charge with a promise to appear before the judge. Gail stated that she did not recall those remarks. She did testify, however, that when Kevin informed her that even the city attorney had been cited and had signed a citation "Promise to Appear" form she responded "I doubt it." In addition, Gail testified that even had she understood the full nature of the citation's "Promise to Appear," etc., that she still wouldn't have signed it. [R., Vol. I, pp. 12, 13, 32, 40.]

Kevin testified that at this point he informed Gail that he must place her under arrest; that he took her by the arm and led Gail to his vehicle. Kevin then suggested that because Gail was dressed only in her nightgown and robe that she should "change" her clothes. Gail then returned to the house [while Kevin waited outside] but shortly she returned still dressed in her nightgown and robe, but wearing shoes. [R., Vol. I, p. 13.] Gail testified that Kevin "pulled" her down the steps and out to the patrol car where he recommended that she go back into her home and "get dressed"; that she went back into the house while Kevin remained outside; that shortly she returned with her shoes but still dressed in her nightgown and robe, at which time she remarked to Kevin that "This is as dressed as I'm going to get so you had better just do what you are going to do"; and that she then walked to the patrol car and entered without assistance. [R., Vol. I, pp. 32, 33.]

With respect to the above sequence of events, the trial court interjected this observation:

THE COURT: Impounded the woman instead of the dog. A fellow like this ought to be relieved of his position as a law enforcement officer.
[R., Vol. I, p. 17.]

Kevin's counsel had elicited testimony from Kevin that prior to August 22, he had observed the Allred dog running "at large," i. e., without leash or chain or otherwise under control in the city and that he had warned Larry Joseph Allred [Gail's husband] about permitting the black Labrador dog to be "at large" or "loose" in the city. Following objection, the trial court refused to admit this evidence. On a number of like occasions the trial court ruled that similar evidence was immaterial or irrelevant. The trial court was clearly erroneous in this respect. The testimony obviously bears on Kevin's "good faith" attitude and conduct, an important, critical element in defense of a § 1983 action. It is the more difficult to rationalize in light of the fact that Larry Joseph Allred testified. When counsel for Kevin argued that the evidence of Kevin's prior receipt of complaints in the city about the Allred dog running at large and Kevin's warning to Larry Allred about the situation should be admitted to establish Kevin's "good faith" defense to the civil rights action, the court said:

THE COURT: Well, the reasonableness of the action complained of is taking a woman in her nightgown down to the hoosegow and putting her in the yammer. [R., Vol. I, p. 20.]

At the conclusion of the evidence, the court made the following statements from the bench relative to the events heretofore related:

THE COURT: Well, this is pretty serious you know. I don't like this business of going up to a woman's home and her seven year old child there crying in the doorway, she is in her nightgown, dragging her out. This is unpermitted touching, that is a battery. What happened to her, she was a victim of a battery. He takes her by the wrist, drags her out, pulls her out. I think that is very serious.

MR. COOK: No doubt, Your Honor.

THE COURT: And all because she wouldn't sign something.

MR. COOK: That is exactly the heart of the case.

THE COURT: Well, you don't have to sign things. This is the 200th anniversary of the freedoms we have got and the old foundations of our government . . . Police abuse is something you have to be watchful about. It started right out when I came to this bench 27 years ago . . .

Now here we have this lady over there in Roosevelt. He hasn't got good judgment or he wouldn't do a thing like this. What's the big rush about that woman coming down to the city hall? You don't have to drag her out of her own home in a nightgown, a child needing her attention, a job that she has to go to in the morning . . . Imagine putting a woman in a place like that [jail] . . . I would [if Gail] feel like taking that fellow apart an inch at a time. That is the kind of activity on the part of the police that is calculated to bring nothing but disrespect for the law . . . So that is a very serious offense committed on that woman.
[R., Vol. I, pp. 50, 51.]

MR. COOK: My only concern in this case is that she [Gail] chose custody herself.

THE COURT: Oh, I don't think so. I don't think she chose anything. Of course she was terribly angry, who wouldn't be angry?

THE COURT: Well, he probably said that [advised her that all she had to do was sign the promise to appear portion of the citation] but do you know what he did, dragged her out of her house by the wrist in her nightgown, barefoot in the mud . . . big bully . . . That is unpermitted touching . . . Sure, there is a violation with the dog . . . she [Gail] isn't running away. . . . Just no reason at all to arrest that woman . . . and throw her in the can. It's outrageous . . . a damned outrage. . . .

THE COURT: . . . all he had to do was go back and report this occurrence and in a more civilized fashion, cite the woman in at the proper time. It could be handled so easily. . . .

[R., Vol. I, pp. 52, 43, 54, 63.]

Kevin then drove to the residence of Justice of the Peace Gale with Gail in the hope that Gail could be arraigned there, only to find that the magistrate was away at his farm. Kevin then drove Gail to the Roosevelt City Police Station. He parked the patrol car in front of the station and proceeded into the station alone in order to report the problem to Officer Richard Young, the officer in charge and "on duty." Young came out of the station within a short time and proceeded to the patrol car with Kevin. Young asked Gail to come with him to the station, where he then asked her questions to fill out a "booking" form. Young then read Gail her rights and informed her that she could make one local telephone call. [R., Vol. I, pp. 14, 33, 34.] Gail phoned her attorney. She was then taken downstairs and placed in a cell which was unoccupied, containing three or four bunks, a toilet, basin and floor drain. Neither Kevin nor Gail testified specifically as to who took Gail to the jail cell, but the record is clear that Kevin did nothing after Gail was in the police station except observe the procedures directed by Officer Young. [R., Vol. I., pp. 14, 26, 33, 34, 35.] It was Officer Young who went downstairs between 5 and 20 minutes after Gail was placed in the cell to bring her upstairs to the conference room where she was arraigned, accompanied by her attorney, Mr. Hall, before Judge Gale in the presence of Officer Young and Kevin. [R., Vol. I, pp. 26, 35.] She pled "not guilty" to the charges contained in Kevin's "Complaint and Notice to Appear" citation and was then released on her own recognizance. Thereafter, following a full trial before Judge Gale, Gail was found guilty and fined $5.00. The conviction was appealed to the state district court but was dismissed after Judge Gale failed to timely transmit the transcript from his court to the district court as required by Utah law.

Gail testified that following her arrest and conviction, she was subjected to humiliation, ridicule, chiding and great embarrassment. She acknowledged on cross-examination that Kevin simply took her wrist when he arrested her and that she didn't struggle or resist as he took her from the doorway of her home to the patrol car even though she "held back." She stated that Kevin requested that she return to the house to change her clothes and that she did return without any physical contact with him whatsoever. Her attorney made it clear that they were not charging Kevin with police brutality. Kevin testified that he didn't jerk her or pull her but simply led her by the arm. When Judge Gale was asked whether he had instructed Kevin on the manner of effecting an arrest and the use of the citation forms, the court sustained an objection on the ground that it was not material. The testimony was elicited in order to show Kevin's "good faith" belief that the procedure he pursued was legally proper.

While Gail was arraigned on August 22, 1975, on the charge contained in Kevin's "citation," the "formal" complaint thereafter prepared by the city attorney, executed by Kevin on August 25, 1975, charged Gail with the same offense, i. e., allowing the dog to "run at large" on August 15, 1975. Some challenge was made at oral argument to the charge against Gail predicated on the contention that because the dog was licensed to her husband, she did not "own" it. However, that contention was not persuasive in the trial court and for good reason. Gail's husband acknowledged that the dog was not owned by him exclusively, but rather by the entire family.

Gail's original complaint named Roosevelt City, a municipal corporation, and Robert Stockwell, Chief of Police of Roosevelt City, as parties defendant with Kevin. Both were dismissed from the action. Even so, prior to entry of judgment against Kevin, the trial court remarked that the judgment against Kevin would be substantial. At the damage appearance hearing on April 5, 1976, the court stated that the damage award would be "big enough" to make sure that Kevin "doesn't do that sort of business anymore" and that he would "make it hurt." [R., Vol. I, p. 71.] The court then asked counsel for Kevin if "the officer" had

insurance coverage. The court was informed that there was some coverage. Thereupon, the trial court commented that these facts, in his opinion, should always be made known even to juries. The court then concluded:

> THE COURT: . . . I don't want to hurt the fellow too much but I want to hurt him some. I think the damages should be substantial. That's a horrible situation and that kid ought to lose his job, number one. . . . poor judgment and poor training . . . hasn't read the ordinance. . . .

[R., Vol. I, pp. 74, 75.]

On appeal, Kevin alleges trial court error in: (1) finding that the arrest which he effected was an infringement of Gail's civil rights, (2) failing to find that even if the arrest was invalid, it did not constitute a violation of Gail's civil rights, (3) failing to admit evidence of or consider the element of Kevin's "good faith" defense to the actions taken, and (4) assessing excessive damages even if Gail's civil rights had been violated.

### I.

■ Gail urges that the "running at large" ordinance, Section 2–24, *supra*, must be read in conjunction with the succeeding "Impoundment of Dog at Large" and "Redemption of Impounded Dog" ordinances of Roosevelt City, Revised Ordinances, 1953, Sections 2–25 and 2–26. The argument is advanced without cogent authority and in a vacuum. Section 2–50 entitled "A Misdemeanor" provides for punishment by a fine or by imprisonment against any person found guilty of "violating *any of the provisions of this chapter.*" The trial court certainly did not consider the impoundment sections exclusive, and for obvious reason. Section 2–25, *supra*, permits impoundment of a dog *only* when it is at large *"away from the premises of the owner* and not secured by a leash or in the immediate possession and control of its owner . . .". Gail's argument on this point is spurious. The Allred dog was not on a leash nor was it in the immediate possession and control

of the Allreds when Kevin observed it on the lawn *of the Allred property* adjacent to the residence. The dog was, however, free, unrestrained and "at large" in violation of § 2–24, *supra.*

■ Gail contends that Kevin was without authority to issue the citation. She insists that there was no justification for Kevin's failure to proceed to her home "without a formal complaint." [Brief of Appellee, p. 5.] The argument advanced by Gail is: ("How simple a procedure: get a proper complaint, go to the home with the intent of serving it, serve it and depart. No one need be arrested. No unreasonableness." [Brief of Appellee, p. 7.] This argument is advanced without cogent authority. There is nothing in this record which indicates that the *mere* or *sole* service of a complaint satisfies the governing Utah procedural requirements.

We have reviewed the cited Roosevelt City ordinances, together with certain Utah statutory enactments, none of which were considered or treated by the trial court. Those statutes, of which we take judicial notice, must be considered by the trial court in reaching a decision whether Kevin pursued his duties properly and without violating Gail's civil rights. Those statutes are:

(A) § 10–6–66, Utah Code Annotated, 1953 Replacement Vol. 2A provides that it:

> . . . shall be the duty of the police force of any city at all times to . . . prevent crime, detect and arrest offenders . . . perform all duties enjoined upon them by ordinance.

(B) § 10–6–67, Utah Code Annotated, 1953 Replacement Vol. 2A provides that:

> Members of the police force shall have the power and authority, without process, to arrest and take into custody any person who shall commit in his presence an offense directly prohibited by any ordinance.

(C) § 10–8–65, Utah Code Annotated, 1953 Replacement Vol. 2A provides that:

> [All cities] may license, tax, regulate or prohibit the keeping of dogs and autho-

rize the destruction, sale or other disposal of the same when at large contrary to ordinance.

(D) § 77–10–1, Utah Code Annotated, 1953, Vol. 8, provides that:

A complaint is a statement in writing made to a court or magistrate that a person has been guilty of some designated offense.

(E) §§ 77–11–6 through 77–11–9, Utah Code Annotated, 1953, as supplemented [L.1975, ch. 50, §§ 1–4] provide for:

Issuance and delivery of a citation requiring any person subject to arrest or prosecution on a misdemeanor charge to appear before a magistrate at a specific date in lieu of the peace officer effecting an arrest by taking a person into custody. Any person so cited who fails to appear on or before the date or court specified is subject to arrest. § 77–11–10, *supra*, provides a penalty for any person who wilfully fails to appear pursuant to a citation.

Although the statutes above cited do not explicitly refer to the need for an "acknowledgment" of receipt of a copy of the citation by the person charged, the trial court must determine whether, based upon all of the facts and circumstances, it is implicitly required in order to establish proof of issuance and delivery. § 77–11–8(1), Utah Code Annotated, 1953 Replacement Vol. 2A requires that a copy of the citation issued shall issue to the person cited. § 41–6–166, Utah Code Annotated, 1953 Replacement Vol. 5A, as amended, 1975, provides that any person who violates · provisions of the Motor Vehicles Act and who is arrested shall be taken without unnecessary delay before a magistrate in the county· most accessible if (a) the person arrested demands an immediate appearance, (b) the person arrested is charged with driving while under the influence, or (c) if the person arrested is charged with failure to stop following an accident involving death, injury or damage to property. Subsection (d) provides that: "In any other event when the person arrested refuses to give his written promise to appear in court as herein-

after provided, or when in the discretion of the arresting officer, a written promise to appear is insufficient." § 41–6–167, Utah Code Annotated, 1953 Replacement Vol. 5A provides, *inter alia*, that the written order to appear to be prepared by the police officer in triplicate shall contain the name and address of the person, the number, if any, of his operator's license, the registration number of the vehicle, the offense charged and the time and place the person is to appear in court. Subsection (d) provides: "The arrested person, in order to secure release as provided in this section, must give his written promise satisfactory to the arresting officer so as to appear in court by signing at least one copy of the written notice . . . the officer shall deliver a copy of such notice to the person promising to appear. Thereupon, such officer shall forthwith release the person arrested from custody." § 41–6–168, Utah Code Annotated, 1953 Replacement Vol. 5A, provides that any person wilfully violating his promise to appear is guilty of a misdemeanor. On January 7, 1959, the Utah Supreme Court promulgated a rule making the above provisions applicable to municipal traffic ordinances. That rule was applied in *Wells v. Ward*, 470 F.2d 1185 (10th Cir. 1972), where this Court held that the owner of a car parked in violation of a Salt Lake City ordinance who refused to sign the parking violation citation promise to appear had no remedy under § 1983 of the Civil Rights Act against various authorities who took him in custody and presented him to a magistrate where he then refused to present his AAA bond card as security for bond and was accordingly placed in a jail cell. The employment of the citation with its attendant "promise to appear" is common under Motor Vehicle Codes. 61A, C.J.S. Motor Vehicles § 593(1). The use of the citation with its "promise to appear" has been sanctioned in relation to simple infractions of the law which do not warrant custodial arrest. The trial court must determine, on remand, whether the use of the citation form in the instant case finds similar justification under Utah law.

█ It is well settled that where the procedure employed is regular on its face the arresting officer is entitled to the qualified immunity defense of a good faith belief that his behavior was proper in a § 1983 civil rights action brought against him. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Atkins v. Lanning*, 556 F.2d 485 (10th Cir. 1977). The *Atkins* case involved a civil rights action filed by Atkins against a police officer, two investigators on the district attorney's staff and the district attorney. Atkins abandoned his claim of false arrest against the police officer and the trial court found the district attorney immune under the absolute immunity ruling announced in *Imbler v. Pachtmann*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The remaining issue, then, was whether and to what extent the two investigators on the district attorney's staff were entitled to any immunity in the § 1983 action. This court stated, *inter alia*:

> As to the district attorney's investigators, it would hardly seem reasonable to exculpate the district attorney and to not immunize his underlings. . . .
>
> * * * * * *

However, even if the investigators are not covered by the quasi-judicial immunity shielding the prosecutor, appellant has failed to demonstrate a violation of his *federal* constitutional rights. Simply because under state common law the slightest interference with personal liberty might constitute a false imprisonment, it does not follow that all such invasions, however trivial or frivolous, serve to activate remedies under the due process clause of the Fourteenth Amendment. The Civil Rights Act was not enacted in order to discipline local law enforcement officials. *Wells v. Ward*, 470 F.2d 1185 (10th Cir. 1972); *Stringer v. Dilger*, 313 F.2d 536 (10th Cir. 1963). In other words, a federal constitutional question must exist not in form but in substance not merely in assertion but in essence and effect. See *Freeman v. Flake*, 448 F.2d 258 (10th Cir. 1971) and cases cited therein. . . .

556 F.2d, at p. 489.

█ In 42 U.S.C. § 1983 actions, officials thus enjoy either an absolute immunity [*Imbler v. Pachtman, supra*] or a qualified immunity [*Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)] from damage liability. The touchstone is whether the accused official exercised the duties within the scope of his authority in "good faith." In *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Supreme Court reasoned that the doctrine of immunity, absolute or qualified, to be extended to public officials, is one of judicial making, and that it involves the delicate balancing of the right of citizens to obtain redress from wrongs committed by public officials and the need to assure that public officials will perform their assigned duties unfettered by the prospect of being subjected to the costs of defense and the consequences of a damage award against them for acts done in the course of their duties. The trial court, in the instant case, gave no consideration to this "delicate balancing" problem.

█ The nature of the particular duty performed by a public official determines the reach and applicability of the official immunity doctrine. *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). Here, we are unable to determine, from the record, those policy decisions which preceded and controlled Kevin's acts in confronting Gail, preparing the citation, requesting her signature and effecting the arrest. The trial court erroneously refused admittance of evidence that Kevin's actions were predicated upon the ordinances, the statutes and the instructions given him by his superiors, and that he acted in good faith. A police officer is protected from liability if he acts upon a good faith belief that the action taken is proper and reasonable. See : *Bivens v. Six Unknown Federal Narcotics Agents*, 456 F.2d 1339 (2nd Cir. 1972); *G. M. Leasing Corporation, et al. v. United States of America*, 560 F.2d 1011 (10th Cir. 1977).

The trial court, consistently and erroneously denied Kevin the right to introduce evidence that he believed his conduct of August 22, 1975, was lawful and that such a belief was reasonably held. The trial court erred in its rulings sustaining objections to Kevin's proffered evidence that he had a reasonable, good faith belief that his conduct was lawful and that probable cause existed for the actions he pursued. It is arguably reasonable, as advanced by counsel for Kevin, to state that perhaps a private citizen, placed in the position and confronted with the circumstances presented to Kevin in this case, may be authorized to effect an arrest for an offense committed in his presence, i. e., a dog "at large." *See*: § 77–13–4, Utah Code Annotated, 1953.

Two significant aspects of this case have not been developed in the record on appeal. The trial court excluded all testimony and evidence relating to the good faith issue, which, in part, involves a legal determination of the use of the citation form requiring Gail's signature.

The cause is reversed and remanded for a new trial in light of the fact that the record does not contain sufficient evidence to determine the citation issue nor to make a determination as to Kevin's good faith.

SETH, Chief Judge, dissenting:

I must dissent from the position taken by the majority, and state that the matter appears to me to be nothing more than a cause of action based on false arrest. The issues relate to the authority of the officer under state law, and this must be first decided.

I would thus dismiss on the ground that no substantial federal question is presented and the plaintiff can seek a remedy in the state courts.