Brenda HARRIS, Appellee,

v.

Paul PIRCH, individually and as Sheriff of Johnson County, Missouri; Lawrence Kipping, individually and as Deputy Sheriff of Johnson County, Missouri, Appellants.

Douglas Rusher.

Nos. 81–1724, 81–2019.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1982.

Decided May 14, 1982.

Rehearing and Rehearing En Banc Denied July 9, 1982.

Robert L. Langdon, Bradley, Langdon & Bradley, Lexington, Mo., for appellee Brenda Harris.

C. B. Fitzgerald, Fitzgerald & Fitzgerald, Warrensburg, Mo., for appellants.

Before HENLEY and McMILLIAN, Circuit Judges, and HUNGATE,* District Judge.

McMILLIAN, Circuit Judge.

Paul Pirch, sheriff, and Lawrence Kipping, deputy sheriff, appeal from a judgment entered in the District Court for the Western District of Missouri finding them liable for damages under 42 U.S.C. § 1983 to Brenda Harris based on her involuntary emergency commitment to the Western Missouri Mental Health Center (Mental Health Center) for observation and testing in August, 1979. Defendants Kipping and Douglas Rusher, deputy sheriff, were charged with committing Harris without proper authority and against her will. Defendant Pirch was charged with ordering and directing the commitment. After a jury trial the district court entered final judgment upon a jury verdict finding Pirch liable for $5,000 actual and $25,000 punitive damages and Kipping liable for $10,000 actual and $50,000 punitive damages. Rusher was found not liable. In addition, the district court awarded Harris $14,635.60 in attorney's fees under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988.

On appeal Pirch and Kipping argue that the district court erred in refusing to grant their motions for directed verdict and for judgment notwithstanding the verdict on the basis that there was no evidence that Pirch was involved in the incident and that Kipping acted reasonably and in good faith in taking Brenda Harris into custody for

---

* The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri, sitting by designation.

evaluation.[1] For the reasons discussed below, we reverse and remand and order the district court to enter judgment for appellants.

We have carefully reviewed the record before us and conclude that there is insufficient evidence to support the jury's verdict. In passing upon a motion for judgment notwithstanding the verdict, we examine the evidence in the light most favorable to sustaining the jury's verdict and give the prevailing party the benefit of all reasonable inferences which may be drawn from the evidence. *Hannah v. Haskins*, 612 F.2d 373, 376 (8th Cir. 1980); *Cleverly v. Western Electric Co.*, 594 F.2d 638, 641 (8th Cir. 1979). Judgment notwithstanding the verdict must be granted if the evidence, so viewed, was such that reasonable persons could not differ as to the conclusion that the plaintiff's proof had failed to meet its burden as to an essential element of the cause of action. *Davis v. Burlington Northern, Inc.*, 541 F.2d 182, 186 (8th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976). "The verdict . . . must be supported by substantial evidence; a mere scintilla is not enough." *Singer Co. v. E. I. Du Pont de Nemours & Co.*, 579 F.2d 433, 440 (8th Cir. 1978) (citations omitted).

The uncontroverted facts establish the following. On August 7, 1979, Robert Harris telephoned the Odessa, Missouri, Police Department requesting aid for a family dispute in which his ex-wife, Brenda Harris, was allegedly trying to kill him. The couple had been divorced on July 7, 1978, but were at that time living together with their two daughters at the home Brenda Harris had been awarded in the dissolution. Two deputy sheriffs from Lafayette County, Missouri, responded to the call but determined that the Harris home was located in Johnson rather than Lafayette County. The Johnson County Sheriff's Office was notified and Deputy Kipping responded. When Kipping arrived at the Harris house the Lafayette officers informed him that Brenda Harris had been hospitalized on February 25, 1979, for an overdose of Thorazine, a tranquilizer, and that Brenda Harris had allegedly threatened Robert and his girlfriend with a knife on a previous occasion.

Kipping interviewed Brenda and Robert separately. Robert told Kipping that Brenda was trying to kill him, that she had previously threatened him and his girlfriend with a knife, and that she had attempted suicide by overdosing on February 25, 1979. Brenda told Kipping that Robert was trying to kill her and that she wanted him arrested. Brenda suffered a black eye and some bruises in the dispute but refused the officers' offer of medical assistance. Kipping did not arrest Robert but ordered him to leave the home. On August 9 and 10, 1979, Brenda went to Dr. Keith Broughton, her personal physician, and obtained prescriptions for Verstran, a tranquilizer, and RuLar, a sleeping aid.

At some time between 8:00 p. m. and 9:00 p. m. on the following Sunday evening, August 12, 1979, Kipping, while on duty, received a telephone call from Robert Harris stating that Brenda had told him that she had taken some pills of her new prescription and that she was going to kill herself. Kipping telephoned Judge Pam Kline of the Circuit Court of Johnson County, Probate Division, for advice. Kipping described Robert's telephone call and the August 7 family dispute and also told Judge Kline that the Lafayette officers had told him that Brenda Harris had recently been hospitalized for overdosing and that it was alleged that she had threatened Robert's girlfriend with a knife. Judge Kline offered to hold a civil commitment hearing but Kipping declined, stating that there

---

1. Kipping also argues that the district court erred in excluding the testimony of Dr. Carlton Lindgren. At trial Harris admitted that Dr. Lindgren had diagnosed her as a paranoid schizophrenic in August, 1978. Lindgren was to testify as to the nature of the disease. The district court excluded the testimony because Kipping did not know of the diagnosis at the time he took Harris into custody. On appeal Kipping argues that the testimony was relevant to the issue of his good faith in deciding that Harris needed to be evaluated. We agree and conclude that the evidence was relevant to the issue of Kipping's good faith.

might not be enough time. Judge Kline then read Mo.Rev.Stat. § 202.123 (1979), repealed by Laws 1980 p. 503 § 1, the emergency provision of Missouri's civil commitment statute, to Kipping over the phone. The provision provides in pertinent part:

> 3. ... a peace officer may take, a person into custody for evaluation and treatment for a period not to exceed ninety-six hours only when ... peace officer has reasonable cause to believe that such person is suffering from a mental disorder and presents a likelihood of serious physical harm to himself or others which is imminent unless immediately taken into custody ... [the peace officer shall] complete an application ... which shall be based upon his own personal observations ... and shall contain the information required in subsection 1 ....[2]

Judge Kline told Kipping that she could not advise him in a specific situation but advised him to telephone the prosecuting attorney and Norman Thomas, a psychiatric social worker at the Mental Health Clinic, or Rosetta Thompson, director of the Mental Health Center.

Kipping was not able to contact the prosecuting attorney but did discuss the situation with Thomas. Thomas told Kipping that if Kipping had information to believe that Brenda was dangerous to herself, she would need to be evaluated at the Western Missouri Mental Health Center, the nearest in-patient mental health facility. The facility is located in Kansas City, Missouri, approximately fifty miles from the Harris home.

Kipping arranged for ambulance service and requested Deputy Sheriff Rusher to accompany him to the Harris home. They arrived at the home at approximately 10:30 p. m. When Brenda answered the door and saw the officers she was already upset. Kipping told her about Robert's telephone call and said that he, Kipping, was worried about her. Brenda became agitated, told Kipping that "it was a lie" and yelled obscenities at Kipping. Kipping asked her if she had taken any medication and she replied that she had only taken her prescription and showed Kipping a partially empty bottle of pills. After being at the home for approximately ten minutes, Kipping made the determination that she had overdosed and told her that he was going to send her to the Mental Health Center for an emergency evaluation.

Brenda and Kipping then spoke, by telephone, to Dr. Broughton. Kipping told Dr. Broughton that Brenda was acting irrationally and that she had telephoned Robert threatening suicide. Dr. Broughton told Brenda to go to the Mental Health Center so that she could be examined and released. After the telephone call, Clarence Kirby, Brenda's neighbor and former brother-in-law, saw the ambulance and went to the Harris home. Brenda requested Kirby to stay with her children, gathered five bottles of prescription medicine[3] and a diet Pepsi, and sat down on the stretcher. At some time prior to Brenda's departure, the ambulance driver informed Kipping that Brenda's vital signs were normal. Neither Kipping nor Rusher accompanied Brenda to the Mental Health Center and neither filled out the application form for emergency commitment required under Mo.Rev.Stat. § 202.123.

Brenda was examined and released after a thirty-minute stay at the Mental Health Center. Dr. Nasim Osman, the examining physician, found no evidence of drug abuse or psychiatric symptoms. Robert had driven to the Mental Health Center but Brenda refused to see him and also refused the Center's offer of transportation. Brenda took a cab to an aunt's home and the aunt drove Brenda home. Brenda arrived home sometime after 3:00 a. m.

---

2. Mo.Rev.Stat. Ch. 202, Department of Mental Health, was in effect from January 2, 1979 to August 1980. The new provisions governing mental health are Mo.Rev.Stat. Ch. 630.

Mo.Rev.Stat. § 632.305.3 is identical to Mo. Rev.Stat. § 202.123.3.

3. When Harris arrived at the Mental Health Center she had the following medications with her: Papase, RuLar, Ativan, Verstran and Synthroid. The record does not indicate what type of medication the drugs are.

The following day, August 13, 1979, Brenda contacted the Johnson County Sheriff's Office concerning her assault complaint against Robert arising from the August 7 dispute. Kipping advised her that she would have to come to the office and sign a complaint. At that time Kipping apologized for the events of the preceding evening. Harris subsequently filed the present § 1983 action against Pirch, Kipping and Rusher alleging that her constitutional rights had been infringed by the arrest and involuntary commitment.

At trial it was established that Harris had been hospitalized for an overdose on February 25, 1979.[4] In addition, Brenda testified that she had confronted Robert and his girlfriend with a knife in August, 1978, and that she had told Robert about her new tranquilizer prescription on the evening of August 12, 1979.

*Sheriff Pirch*

It is uncontested that Pirch was not personally involved in Brenda's emergency commitment. At trial it was established that Pirch had been in Cape Girardeau, Missouri, the week preceding the incident attending the Missouri Sheriff's Association Convention. It is not clear from the record whether Pirch had returned to Johnson County by August 12, 1979. The only evidence relating to his whereabouts on that date was the following exchange between Pirch and his attorney:

Q. Now, where were you—that was on a Monday, the 12th was on a Sunday. Where were you that weekend?

A. Before that?

Q. Yes, sir.

A. At Cape Girardeau.

However, it was established that Pirch was not on duty that night and that Brenda has never spoken with him regarding either the August 7 dispute or the August 12 commitment.

A § 1983 action against police supervisory officers cannot be based upon the theory of respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Moreover, it appears that the Supreme Court has held that a § 1983 action will not lie against police supervisory officers for failure to prevent police misconduct, absent a showing of direct responsibility for the improper action. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977). What is required is a causal connection between the misconduct complained of and the official sued. *See McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979). "Liability may be found only if there is personal involvement of the officer being sued." *Watson v. Interstate Fire & Casualty Co.*, 611 F.2d 120, 123 (5th Cir. 1980).

In the present case Harris argued that liability can be imposed upon Pirch because he ordered and directed the action taken against her. We have carefully reviewed the record and conclude that there is no evidence supporting Harris' assertion.

At trial Pirch unequivocally testified that he first learned of the incident on Monday, August 13, 1979, when he read Kipping's report. Pirch further testified that he had no personal knowledge of either the August 7 family dispute or the August 12 commitment. *Id.* This testimony was corroborated by Kipping's testimony that he tried to contact Pirch on the evening of August 12 but was unable to do so.

The only evidence offered by Harris in rebuttal is a statement made by Kipping in his deposition. Harris' counsel asked Kipping, "[d]id you call the Sheriff at that time?", to which Kipping responded, "I believe I did, I'm not sure." Harris argues that Kipping's uncertainty is evidence that Pirch lied at trial and further that he or-

<hr>

4. At trial Harris testified that the overdose had been accidental. However, Defendant's Exhibit 8–a, "Progress Notes, Lexington Memorial Hospital" reveal that Harris told the nurse on duty that she had intended to take her life and that she was under the care of a psychiatrist.

dered and directed Harris' commitment.[5] We disagree.

Kipping's uncertainty in answering a deposition question does not establish a causal connection between the commitment and Pirch. More importantly, assuming arguendo that such a call was made, there would still be no evidence supporting liability because Harris does not allege or offer proof as to the content of the alleged conversation. The alleged phone call occurred during the same period of time that Kipping spoke with Judge Kline and Thomas and described a potential emergency situation. The statute upon which Kipping was relying, Mo.Rev.Stat. § 202.123, authorized peace officers to involuntarily commit persons without a hearing if the conditions specified in the statute were satisfied. Therefore, unless Harris alleged that Pirch advised Kipping to commit Harris regardless of her condition or in contravention of Mo.Rev.Stat. § 202.123, there would be no basis for liability under § 1983.[6]

It was incumbent upon Harris to adduce evidence demonstrating Pirch's personal involvement in the events of August 12, 1979. Having failed to do so, we conclude that the district court should have granted Pirch's motion for judgment notwithstanding the verdict.

*Deputy Sheriff Kipping*

At trial Kipping argued that he acted upon his reasonable and good faith belief that Harris was attempting to overdose and needed to be evaluated at the Mental Health Center. Kipping further argued that, pursuant to his telephone conversation with Judge Kline and Thomas, he reasonably believed that he had the authority to take the action he did under Mo.Rev.Stat. § 202.123. Kipping's motions for directed verdict and judgment notwithstanding the verdict based on his reasonable good faith belief were denied.

■ In § 1983 actions for damages defendants are entitled to a qualified immunity from liability based on a good faith belief in the propriety of their actions and reasonable grounds for that belief. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Therefore, "[w]hen a court evaluates police conduct relating to an arrest its guideline is good faith and probable cause." *Id.* at 245, 94 S.Ct. at 1691, *citing Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Landrum v. Moats*, 576 F.2d 1320, 1327 (8th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978). "Thus, even though a police officer may not have chosen the wisest or most reasonable course of action, he will not be civilly liable if his conduct is based on a reasonable and good faith belief that it was necessary under the circumstances." *Glasson v. Louisville*, 518 F.2d 899, 910 (6th Cir. 1975).[7]

■ The burden of pleading the defense of good faith lies with the defendant. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980); *Landrum v. Moats*, 576 F.2d at 1324–25. In exam-

5. Harris also appears to argue that Pirch's failure to investigate the incident is evidence of his liability. However, we note that Pirch read Kipping's report and discussed the incident with him. In addition, Harris went to the sheriff's office on August 13 and told him that she had been released. We also note that it is uncontested that prior to the incident Pirch had explained the requirements of Mo.Rev.Stat. § 202.123 to his personnel.

6. Harris does not allege that Missouri's civil commitment statute is unconstitutional.

7. The liability imposed by the state statute for commitments pursuant to Mo.Rev.Stat. § 202.-123 provides:

202.200 No liability for persons responsible for commitment or detention—exceptions.— No officer of a public agency ... nor any peace officer responsible for detaining a person pursuant to ... sections 202.110 to 202.-225 shall be civilly or criminally liable for detaining or releasing a person ... at or before the end of the period for which he was admitted or committed ... provided that such duties were performed in good faith and without gross negligence.

The identical provision is found in Missouri's new Department of Mental Health statutes at Mo.Rev.Stat. § 632.440.

ining whether Kipping established that he acted in good faith and whether his belief that his actions were necessary to protect Harris was reasonable under the circumstances, it is "our duty ... to make an independent examination of the whole record." *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963). "It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Gomez v. Toledo*, 446 U.S. at 641, 100 S.Ct. at 1924, *citing Scheuer v. Rhodes*, 416 U.S. at 247–48, 94 S.Ct. at 1691–92. *See also Putman v. Gerloff*, 639 F.2d 415, 422 (8th Cir. 1981) (issue of good faith in § 1983 cases is one of fact under all the existing circumstances). Our examination of the record, viewing the evidence in the light most favorable to sustaining the jury's verdict and giving Harris the benefit of all reasonable inferences which may be drawn from the evidence, convinces us that there is insufficient evidence to support the jury's verdict.

■ On appeal Harris argues that Kipping's actions were not reasonable because there was no evidence that she had overdosed. In support she notes that the two ambulance attendants testified that her vital signs were normal when she was sent to the Mental Health Center.[8] Harris further argues Kipping was not acting upon a good faith belief as evidenced by the fact that he sent her to the Western Missouri Mental Health Center which was located fifty miles from her house rather than to the Warrensburg Hospital which was located twenty

miles from her house.[9] Harris also argues that Kipping's failure to fill out an application form as required by Mo.Rev.Stat. § 202.123 supports the inference that he did not act in good faith.[10] We disagree.

When Kipping received Robert's telephone call he knew that Harris had been hospitalized six months earlier for a drug overdose and that she had allegedly threatened Robert and his girlfriend with a knife. This information was relayed to Kipping by a Lafayette County deputy sheriff when Kipping responded to the August 7 family dispute. The information was corroborated by Robert.

Kipping immediately telephoned Probate Judge Kline for advice. Judge Kline testified that Kipping asked her whether there was a section of the civil commitment statute "that would permit him, without a court hearing, to provide assistance to this lady [Harris]."[11] Judge Kline read Mo.Rev. Stat. § 202.123 to Kipping over the telephone and advised him to call the prosecuting attorney and Thomas, a psychiatric social worker, or Rosanna Thompson. Judge Kline testified that Thomas and Thompson were the only local mental health professionals and that they had been involved in a number of Mo.Rev.Stat. § 202.123 procedures.

Kipping followed Judge Kline's advice and attempted, unsuccessfully, to contact the prosecuting attorney. Kipping did contact Thomas who testified that he told Kipping, "if he [Kipping] felt that she [Harris] would not be—would not live, that she was dangerous to herself, that she should probably be—need to be evaluated at [the Western Missouri Mental Health Center]."

---

**8.** The record establishes that the vital signs measured by the ambulance attendants were Harris' blood pressure, pulse and the dilation of her eyes.

**9.** There is no evidence in the record as to whether the Warrensburg Hospital accepts patients committed under Mo.Rev.Stat. § 202.123 for diagnosis and evaluation.

**10.** Harris also states that Kipping's failure to follow-up on Harris' complaint against her husband arising out of the August 7 family dispute

is evidence of his bad faith. However, it is undisputed that once a complaint is filed, it is the prosecuting attorney's decision whether to prosecute. The prosecuting attorney decided not to prosecute Harris' complaint. In addition, Robert had not returned to Harris' home as of the date of trial and she had not filed other complaints against him.

**11.** Judge Kline testified that it would have taken approximately three hours to hold the hearing.

Kipping and Rusher were the first persons to arrive at Harris' home on August 12 and both testified that she was upset when they arrived. Rusher stated, "I remember she was upset as soon as we got there. She became angry and started the profanity after she was told [about Robert's telephone call]." Harris told Kipping that she had only taken her prescription and showed him a partially empty bottle of the August 9 or 10 prescription.

It is true that both ambulance attendants testified that Harris' vital signs were normal. In addition, Rusher testified that he had no way of knowing whether Brenda had overdosed and in an earlier deposition had stated:

> She didn't appear to be on drugs. You know, that could be at different stages as far as overdose or being unconscious or completely unaware of what's going on. She was not in that condition. And from observations that I could make at the time, she didn't appear to be on drugs. Like I said I don't know how many pills she had taken or, she could have been and I wouldn't have it. I wouldn't know how to determine that actually.

Moreover, Kipping admitted that he knew her vital signs were normal and for that reason he had her taken to the Mental Health Center rather than the Warrensburg Hospital, which was nearer. We note that Mo.Rev.Stat. § 202.123 specifies that the person is to be taken to a mental health facility. It is undisputed that the Western Missouri Mental Health Facility is the closest mental health facility to Harris' home.

However, that evidence cannot be viewed alone. See *Glasson v. Louisville*, 518 F.2d 899. Kipping testified that he saw the partially empty bottle of pills and knew that "some pills don't take effect immediately." That testimony is corroborated by Thomas' testimony that the onset of physical symptoms of an overdose varies depending on the type of medication, its strength and how much was taken. Similarly, Dr. Nasim Osman, Harris' treating physician, testified that it required a lot of experience and education to determine whether a person

has overdosed. Dr. Broughton, Harris' personal physician, testified that he spoke with Harris and Kipping by telephone, that Kipping explained the situation and that he, Dr. Broughton, told Harris that "under the circumstances she probably should go [to the Mental Health Center] ... and they would find out what the problem was and release her."

In addition, all of the persons present at the Harris home on the evening of August 12, including Harris, testified that she was emotionally upset. For example, Roy Barker, one of the ambulance attendants, testified that "other than her emotions, she appeared normal." Kirby testified that she was "very upset." All the persons present also testified that Kipping was polite to Brenda and did not coerce or restrain her in any way. Similarly, both ambulance attendants testified that after Brenda and Kipping had spoken with Dr. Broughton, she went upstairs, got dressed, gathered her medications and a diet Pepsi, and voluntarily sat down on the stretcher.

Kipping admits that he did not fill out the application form but testified that it was his understanding after speaking to Judge Kline and Thomas that the form was not required in emergency situations. This testimony is corroborated by Judge Kline's testimony that the statute was a new law and "everyone was trying to get used to it." She also testified that "in practice, if a peace officer brings a person up [to a mental health facility] or causes a person to be taken up, say, by ambulance, most of the time the paperwork [application] is filled out there at the facility itself." Judge Kline further testified as to the witness list required on the application, "I knew from experience, from talking with the mental health coordinators out there, that list is not crucial. They can fill it in later."

The following day Kipping advised Harris as to the proper procedure for filing a complaint against Robert for the August 7 family dispute and apologized to her for the events of the preceding evening.

The uncontroverted evidence shows that Kipping knew of Harris' recent hospitalization, that Harris was upset when they arrived and became more upset and angry when Kipping questioned her about the alleged overdose and that Harris showed Kipping a partially empty bottle of pills. The evidence also shows that Kipping spoke with Dr. Broughton and Dr. Broughton advised Harris to go to the Mental Health Center. In addition, prior to taking any action, Kipping discussed the situation with Judge Kline and Thomas and attempted to contact the prosecuting attorney in an effort to determine what he could do under the state statute. Under such circumstances we conclude that Kipping acted in good faith and had reasonable cause to believe that Harris had attempted to overdose. On this basis we hold that Kipping is immune from liability for both compensatory and punitive damages to Harris and should have been granted judgment notwithstanding the verdict. *Cf. Landrum v. Moats,* 576 F.2d at 1327 (defense of good faith applicable to action based on excessive force if police officers "(1) believe that a certain amount of force is necessary to make an arrest, (2) believe that use of that amount of force is lawful under the circumstances, and (3) have reasonable grounds for each of the foregoing beliefs, ... even if the use of force turns out, *ex post,* to have been illegal or excessive." (citations omitted)); *Richardson v. City of Conroe,* 582 F.2d 19 (5th Cir. 1978) (If city police officers had a reasonable good faith belief that actions they took in effectuating arrest, during course of which plaintiff was shot, they could not be held liable for resulting injuries.); *Allred v. Svarczkopf,* 573 F.2d 1146, 1153 (10th Cir. 1978) (A police officer is protected from civil rights liability if he acts on the good faith belief that the action taken is proper and reasonable.).

*Attorney's Fees*

■ The district court awarded Harris $14,635.60 for attorney's fees and expenses pursuant to the Civil Rights Attorneys'

Fees Award Act of 1976, 42 U.S.C. § 1988. That Act provides in relevant part (emphasis supplied): "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983 ... the court, in its discretion, may allow the *prevailing party,* other than the United States, a reasonable attorney's fee as part of the costs." The district court's grant of attorney's fees is nullified by this reversal. "A reversal of an entire judgment negates the judgment and any orders based upon it." *Royal Business Machines v. Lorraine Corp.,* 633 F.2d 34, 49 (7th Cir. 1980).

Accordingly, the judgment of the district court is reversed and remanded to the district court with directions to enter judgment notwithstanding the verdict as to Pirch and Kipping.