Alice DeVASTO, Plaintiff-Appellant,

v.

Robert FAHERTY, Patrick Rose and
David Johnstone,
Defendants-Appellees.

No. 80–1598.

United States Court of Appeals,
First Circuit.

Heard June 3, 1981.

Decided Sept. 11, 1981.

Jeffrey Kobrick, Cambridge, Mass., with whom John Reinstein, Boston, Mass., was on brief, for plaintiff-appellant.

Steven P. Perlmutter, Asst. Corp. Counsel, Boston, Mass., with whom John Giuliani, Jr., Charlestown, Mass., was on brief, for defendants-appellees.

*  Of the District of Massachusetts, sitting by designation.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, MAZZONE,* District Judge.

BOWNES, Circuit Judge.

This is an appeal by plaintiff Alice De-Vasto from a jury verdict in favor of defendants in a § 1983 civil rights action. Plaintiff sought damages from two officers of the Boston Penal Department, Patrick Rose and David Johnstone, and a sergeant in the Boston Police Department, Robert Faherty, for an alleged illegal forcible entry and search of her home and for an unlawful assault on her by defendant Faherty. In addition to the usual appeal from the judgment and denial of her motion for a new trial, plaintiff also appeals the refusal of the district court, 479 F.Supp. 1069, to allow her to amend her complaint by adding the City of Boston as a defendant and the denial of her motion for a judgment of default against defendant Johnstone, who did not appear at the trial, and her motion for judgment n. o. v. or a new trial as to Johnstone.

The standard of review is clear: "In reviewing a motion for judgment n. o. v., it is improper to weigh credibility or resolve conflicting testimony. The motion is properly granted only when, as a matter of law, no conclusion but one can be drawn." *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 (1st Cir. 1978) and cases cited therein. "A motion for a new trial is addressed to the sound discretion of the trial court and will be reversed only for abuse of that discretion." *Id.*

The events leading up to the incident that precipitated this law suit were stipulated. Plaintiff's son, Arthur DeVasto, escaped from the Deer Island House of Correction on June 24, 1976. On the evening of June 29, 1976, the defendants and two uniformed Boston policemen [1] came to plaintiff's home at 15 Bonair Street in West Roxbury looking for him. Defendants had no search warrant. Relying on an arrest warrant

1.  Plaintiff dismissed her claims against these officers prior to trial by stipulation of the parties.

they had for DeVasto, they entered and searched plaintiff's home over her strenuous objections. Arthur DeVasto was not found.

Our review of the evidence is made in the light most favorable to defendants.

Joseph Scolponetti, a neighbor of plaintiff, was her first witness. He testified that he was an eyewitness to the incident giving rise to the law suit. According to Scolponetti, five men approached plaintiff's house. After watching the two men in police uniforms walk to the rear of the house, Scolponetti "focused all [his] attention to the front door and listened to the conversation at the front door." His testimony can be capsulated as follows: Sergeant Faherty either knocked on the door or rang the doorbell and, when plaintiff answered, told her, in a "very gentlemanly manner," that he was searching for an escaped convict and would like to search her home. Plaintiff asked if he had a search warrant; he repeated that "we would like to search your home." Plaintiff said, "You are not coming into my home unless you have a warrant." Faherty then "reached across his body and opened the front door, made one lunge into the house, grabbed Mrs. DeVasto by the upper arm and threw her out on her front lawn." The officers then entered the house, and Scolponetti picked plaintiff off the lawn. On cross-examination some question was raised as to Scolponetti's ability to hear and see from where he was standing the events to which he had testified. Photographs were subsequently introduced by defendants that could cast doubt on Scolponetti's ability to see plaintiff's front door from his location.

Plaintiff testified as follows: Her son had not been living with her prior to his committal to Deer Island. He had separated from his wife, had no permanent address and "just drifted." About 8:00 P.M. on the evening of June 29 a man came to her door. He introduced himself as Officer Johnstone, a state policeman, and explained that he was looking for Arthur DeVasto. Plaintiff responded that Arthur was her son. Johnstone then asked if she knew he had escaped. She replied that she had received a phone call from her daughter-in-law telling her that she had heard that Arthur had escaped. When Johnstone questioned her about the possible whereabouts of her son, she told him that she had no idea where he was and didn't know who his friends were. Johnstone advised her that her son was in a lot of trouble, that he could be hurt, and that she could be in trouble if she harbored him. She said that she wanted to cooperate, that she didn't want anything to happen to her son, and that she would call the State Police Barracks in Boston if she learned anything of her son's whereabouts. Johnstone did not ask to search her house.

After this conversation, plaintiff locked the screen door, but not the main door. She changed into a nightgown and waited for a visit from a girl friend. About twenty minutes later there was a knock on the door. At the door were five men: three uniformed policemen, Johnstone and another man in plain clothes. A man who she later learned was Faherty said they were looking for an escaped convict, Arthur DeVasto, and were going to search the house. She asked Faherty if he had a warrant. He replied, "We don't need one." She then said, "I know my rights." Whereupon, Faherty "pulled open the screen door and came into the house, grabbed a hold of me, picked me up and threw me out onto the front lawn."

The testimony of the two defendants present at the trial differed significantly from that of plaintiff. Defendant Rose was the first witness for the defense. He testified that he was a corrections officer at the Suffolk County House of Correction and that he and Johnstone were assigned to an inmate apprehension team; Johnstone was his superior. DeVasto's personal information form gave his mother's address as his home address and listed his mother as the person to notify in case of an emergency. After DeVasto's escape, Rose and Johnstone checked all of DeVasto's known hangouts in Roslindale. They contacted DeVasto's former wife who told them that he had called her, blamed her for all of his trou-

bles, and told her "that he was coming down to get her." DeVasto's ex-wife also told Rose and Johnstone that DeVasto would not seek help from his father, but would probably turn to his mother. (DeVasto's father and mother were divorced). Based on this conversation, Rose believed that DeVasto would use his mother's car to go to the Cape, where his ex-wife lived.

During the late afternoon of Tuesday (June 29), Rose and Johnstone began a surveillance of plaintiff's house from an unmarked police car. As Johnstone was looking at a picture window on the left-hand side of the house he exclaimed, "Isn't that him?"[2] Rose, who saw a figure in the window but couldn't identify it, said, "I don't know." Johnstone then said, "Let's go." Rose went around to the back of the house while Johnstone went to the front door. When Johnstone returned, he told Rose that the plaintiff had said she didn't know that Arthur had escaped. Johnstone called District 5 of the Boston Police Department for assistance. A short time later, Sergeant Faherty arrived on the scene. A few minutes later another cruiser arrived with two uniformed policemen. The two officers in uniform went to the rear of the house; Rose, Johnstone and Faherty proceeded to the front door. Mrs. DeVasto answered Sergeant Faherty's knock on the door. He informed her that they had an arrest warrant for Arthur DeVasto. She asked if they had a search warrant; Faherty replied that they didn't need one. An argument then ensued between plaintiff and Faherty as to whether a search warrant was necessary. Both of them had raised their voices until they were yelling at each other. Faherty opened the screen door and "Mrs. DeVasto came at him. The next thing I know, Mrs. DeVasto was on me, and she was hitting me and everything." Rose grabbed her by the arms. When she stopped struggling he released her arms and she slumped to the ground. Rose then went into the house. During his search of

the bedroom, he saw a Deer Island jacket and dungarees on the bed and a lock pick on the dresser.

We conclude our recapitulation with the testimony of Sergeant Faherty. Faherty graduated from Northeastern University with an associate's degree and a bachelor's degree in law enforcement. At the time of trial, he was working towards a degree in public administration at Suffolk University.

On June 29, 1976, Faherty received a phone call from a Deer Island corrections officer who told him that he was watching the house of an escapee at 15 Bonair Road in West Roxbury. After verifying that there was an arrest warrant out for Arthur DeVasto, Faherty drove to Bonair Road in an unmarked cruiser. He asked the two corrections officers on the scene if they had reasonable cause to believe that DeVasto was in the house. Johnstone said "Yes" and then related the conversation he had with plaintiff. Johnstone also told Faherty that he had seen DeVasto in the picture window and that he considered DeVasto to be armed and dangerous. Faherty then called for a marked police cruiser. After the two uniformed police officers arrived, Faherty gave them the information he had received from Johnstone. As Faherty, Johnstone and Rose approached the front door, Johnstone said that if plaintiff was told by Faherty that he and Rose were correction officers, they probably would be allowed into the house peacefully.

Faherty knocked on the front door and plaintiff appeared. He told her that the two men with him were corrections officers, that they had reasonable cause to believe that her son, Arthur, was in the house, and requested peaceful entry for a search. Mrs. DeVasto then said that her lawyer had told her that they had no right to come into the house without a search warrant. Faherty insisted that all that was necessary was the arrest warrant. An argument ensued during which Mrs. DeVasto's voice grew louder

---

2. The parties agreed prior to trial that Johnstone's statements could be admitted in evidence as bearing on the state of mind of Rose and Faherty. Our recapitulation of the testi-

mony does not constitute or infer a ruling on whether such statements do in fact fall within Federal Rule of Evidence 803(3).

and she began to scream hysterically. She "backed up into the doorway, put her hand on the door and stated, you're not coming into my house without a search warrant." Faherty, thinking that plaintiff was going to slam the door shut in their faces, pulled the screen door open. "And with this she came lunging out the door screaming and hollering." Faherty stepped aside. As he started into the house, he turned and saw plaintiff beating on Rose's face and chest. After Rose had grabbed her by the arms, Faherty proceeded into the house. Faherty testified emphatically that he had "never laid a hand" on plaintiff.

We start our review of the alleged trial errors with the admission of Rose's testimony that he saw a Deer Island jacket and dungarees on a bed and a lock pick on a dresser when he searched plaintiff's house. Prior to this testimony, there was a bench conference and plaintiff's counsel had objected on the grounds that, because the defendants did not know of the presence of these items when they entered the house and a search cannot be justified by what it turns up, it was not relevant on the issue of probable cause and that it was highly prejudicial. Defendants argue on appeal for the first time that the testimony was admissible for impeachment purposes because it contradicted plaintiff's testimony that she had not heard from her son since his escape from Deer Island. But the evidence was not offered for impeachment purposes or so limited. There was no mention of impeachment or credibility at the bench conference. And the court in ruling on the objection indicated clearly that it was being admitted on the issue of probable cause.

We think the testimony should have been excluded. It was not relevant on the issues of probable cause and defendants' good faith. The discovery of the dungarees and lock pick had no bearing on what the defendants believed prior to their entry into plaintiff's home. The evidence was relevant only for the purpose of impeaching plaintiff's testimony that her son had not been at her house. But without an instruction carefully restricting the use of the evidence to that purpose, its prejudicial impact was overwhelming. Moreover, the premise that the fruits of a search cannot be the basis for determining whether fourth amendment requirements were met is firmly established. *See, e. g., Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963); *Rios v. United States,* 364 U.S. 253, 261–62, 80 S.Ct. 1431, 1436–37, 4 L.Ed.2d 1688 (1960); *United States v. DiRe,* 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948). We can think of no reason why this doctrine should not apply to a civil rights action alleging an unconstitutional search of a person's home.

The more difficult question is whether the ruling was harmless error or affected a substantial right of the plaintiff. 28 U.S.C. § 2111,[3] Fed.R.Civ.P. 61.[4] This determination must be made in the context of the case as gleaned from the record as a whole. *McKinnon v. Skil Corp.,* 638 F.2d 270, 276 (1st Cir. 1981); *Garbincius v. Boston Edison Co.,* 621 F.2d 1171, 1175 (1st Cir. 1980). The liability of defendants hinged on whether they had a good faith belief that Arthur DeVasto was in the house before they entered and searched it and the jury was so instructed. The good faith belief of Rose and Faherty depended heavily on whether the jury found that they believed what Johnstone had told them, particularly about seeing DeVasto in the window. The jacket and lock pick testimo-

**3.** On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

**4.** No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

ny of Rose was admitted generally without any cautionary instructions at the time or in the final charge to the jury. The jury was, therefore, free to consider it as confirming what Johnstone had told Rose and Faherty about seeing DeVasto in the window, and also confirming Rose and Johnstone's suspicion that he would go to his mother's home. In addition to Johnstone's statements, the only other evidence bearing on defendants' reasonable belief was DeVasto's listing of his mother's address as his home on the prison information sheet and his ex-wife's telephone statement to Rose that DeVasto would probably go to his mother rather than his father for help. The jury could well have considered Rose's testimony as the capstone to defendants' claim that they reasonably believed Arthur DeVasto was in the house. A substantial right of the plaintiff was affected: the right to have the jury decide whether the defendants had reasonable grounds for the search without its fruits being disclosed or, at the minimum, not being put in evidence without a careful, cautionary instruction. There must be a new trial.

Our ruling obviates a detailed discussion of the other alleged errors but, because there will be a new trial, some comments are necessary.

■ We think that, although not seriously prejudicial in the context of the case, the cross-examination of plaintiff relative to her son's incarceration at Walpole State Prison, a maximum security institution, at the time of trial was not relevant and should have been excluded.

■ Although the failure to either object or move to strike was fatal, the questions on cross-examination of plaintiff about the police department investigation of the incident, exonerating defendants, were not rel-

evant and were prejudicial. If a timely objection or motion to strike had been made, see Fed.R.Evid. 103(a)(1), it should have been sustained.

Plaintiff's claim as to improper argument by defense counsel is at best *de minimis.* The record on this point is not nearly as definitive as plaintiff asserts. Moreover, plaintiff's attorney failed to make a timely objection, which in the absence of plain error precludes our consideration of the issue.

The next issue concerns the verdict for the absent defendant, David Johnstone. Plaintiff advances two arguments, that the district court erred in not granting her motions for directed verdict and judgment n. o. v. and that the court should have defaulted Johnstone for failure to "make discovery."

This unique situation requires some explanation. Johnstone was represented by counsel from the pleading stage through the trial,[5] so there was no default under Federal Rule Civil Procedure 55(a).[6] Sometime after suit was filed, Johnstone moved from Massachusetts to New York. Neither his counsel nor plaintiff's attorneys were able to locate him. Consequently, his deposition could not be taken. A short time prior to trial Johnstone's attorney did locate him and promptly contacted him. Johnstone told his attorney that he was not going to attend the trial. This information and Johnstone's address was promptly given to plaintiff's counsel.

There was an extensive pretrial discussion in chambers on how to handle the Johnstone problem. Defendant Faherty's motion that Johnstone be tried separately was approved by plaintiff and denied by the court. At the start of the trial, the court instructed the jury:

---

5. Although his trial attorney, John J. Guilani, Jr., omitted to state in his opening that he represented Johnstone, he began his closing argument with these words: "I would like to remind you that my clients are Mr. Rose and Mr. Johnstone and that my remarks will be addressed to their respective positions."

6. Federal Rule of Civil Procedure 55(a) provides:

(a) *Entry.* When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his default.

The parties have stipulated that Mr. Johnstone, at the beginning, is one of the three defendants in the case, is unavailable. The defense counsel have made an effort to get him here. He has chosen not to come, and neither defense counsel nor plaintiff's counsel have any legal means of forcing him to come here and to participate in this trial. So, he will not participate in the trial. But you are not, from that, to draw any inferences either against the defendants or for the defendants or against the plaintiff or for the plaintiff.

When Rose started to testify as to what Johnstone had said, the court interrupted and told the jury:

The testimony that you are hearing now and of which there will be more as to what Mr. Johnstone said to various of the defendants after this particular moment in time, may be used by you against these defendants only, or against the plaintiff; for the defendants, only insofar as it bears on what they perceive what their state of mind was, but not to establish the truth of what Mr. Johnstone said.

After the charge, plaintiff moved for a directed verdict against Johnstone because "I don't think there is sufficient evidence on Mr. Johnstone to go to the jury, he not having testified other than hearsay what he said." Although this motion should have been made at the close of the evidence, we think it adequately reserved plaintiff's rights on the issue;[7] a motion for judgment n. o. v. as to Johnstone was timely filed.

■ We think that the motion for directed verdict or judgment n. o. v. should have been granted. The trial court had instructed the jury that any statements by Johnstone could not be considered "to establish the truth of what Mr. Johnstone said." In its final instruction, the court told the jury that the liability of Rose and Johnstone depended on whether they had a good faith belief that Arthur DeVasto was in the plaintiff's house:

Let me just go back to that a minute. If you find that Johnstone and Rose in good faith believed that Mr. DeVasto was in the house, then you should fill out on this form, which is again, I'm afraid, a fairly lengthy form, that you find Johnstone not liable. That is, if he had a good faith belief that Mr. DeVasto was in the house, then you must find him not liable. Similarly with respect to the Defendant Rose, if you find that he had a good faith belief that Arthur DeVasto was in the house then you should find him not liable.

Under *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), the defendant in a civil rights action has the burden of pleading and proving good faith. Good faith belief is defined as follows:

"[i]t is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes, supra,* [416 U.S. 232] at 247–248 [94 S.Ct. 1683 at 1691–92, 40 L.Ed.2d 90]. The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right," *Wood v. Strickland, supra,* [420 U.S. 308] at 321 [95 S.Ct. 992 at 1000, 43 L.Ed.2d 214].

*Id.* at 641, 100 S.Ct. at 1924.

With the court's instructions as the law of the trial, Johnstone could not prove his good faith belief that Arthur DeVasto was

7. Defendant cites *Gillentine v. McKeand,* 426 F.2d 717 (1st Cir. 1970), as barring plaintiff's claim because of the failure to move at the close of defendants' evidence. We do not think *Gillentine* is apposite. In that case, defendant moved for a directed verdict at the close of plaintiff's case, but not at the close of all the evidence. We noted that where defendant's evidence was substantial, it might well change the sufficiency of the plaintiff's case and since the case was submitted to the jury unconditionally it could not challenge the sufficiency of plaintiff's evidence. We held that the motion for directed verdict made at the close of plaintiff's case "expired upon the introduction of defense evidence" *Id.* at 722–23.

in the plaintiff's house without testifying in person or by deposition. The jury was explicitly precluded from finding that what Rose and Faherty reported as statements by Johnstone were true.[8] Whether they were true or not made no difference as to Rose and Faherty if the jury found they believed them and had reasonable grounds for so believing. But the jury could not determine whether Johnstone acted sincerely and with a belief that he was doing right unless he testified and was subject to cross-examination on the facts.

Defendants' argument that the jury may not have found that plaintiff had made out a prima facie case is far off target. Plaintiff did not have to depend upon any jury findings to establish a prima facie case; the stipulated facts did this. It was agreed that the defendants entered plaintiff's house without a search warrant and without her permission. Whatever testimony the jury believed or disbelieved could not alter these given facts.

We rule that it was error not to direct a verdict for plaintiff against Johnstone. We do not reach the "default" issue.

Finally, we consider whether plaintiff's motion to amend her complaint by adding the City of Boston as a defendant should have been allowed. Unlike most cases involving amendments sought under Federal Rule of Civil Procedure 15(a), timing is not an issue here. Plaintiff's motion was brought three months prior to trial. The ruling on it was based solely on legal grounds, not on grounds that it came too late. The amendment to the complaint alleged that it was "the established practice, custom or policy of the City of Boston, and of its police and penal departments, to conduct searches of private homes without first obtaining a search warrant for the purpose

of executing an arrest warrant." It was further alleged that defendants followed this custom, policy and practice in searching plaintiff's home. In opposing the amendment, the City claimed that its custom and policy was constitutional and in accord with the established law of the Commonwealth of Massachusetts. The City, therefore, raised a good faith immunity defense; plaintiff conceded its good faith, but not its immunity. The district court ruled, after a careful analysis of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977), and other cases,[9] that "the City's good faith role in this action, thus precludes the existence of a claim against the City."

■ This was, in effect, a dismissal under Federal Rule of Civil Procedure 12(b)(6), "failure to state a claim upon which relief can be granted." Our review, therefore, is not controlled by the abuse of discretion standard which normally applies to rulings on motions to amend the pleadings. Fed.R. Civ.P. 15(a); the question is whether there has been an error of law. In making our determination, we are, of course, bound to consider the controlling law at the present writing, not at the time of trial. In *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Supreme Court rejected "a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violation," *id.* at 650, 100 S.Ct. at 1415, and held that "municipalities have no immunity from damages liability flowing from their constitutional violations." *Id.* at 657, 100 S.Ct. at 1418. By hindsight, therefore, the district court erred when it refused to allow the City of Boston to be added as a defendant. We note also that the law

---

**8.** No attempt was made by Johnstone's counsel to offer Johnstone's statements, particularly the one about seeing Arthur DeVasto in the picture window, under Federal Rule of Evidence 803(1), which as a hearsay exception provides: *"Present sense impression.*—A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter."

**9.** *Sala v. County of Suffolk*, 604 F.2d 207 (2d Cir. 1979), *vacated*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); *Owen v. City of Independence*, 589 F.2d 335 (8th Cir. 1978), *rev'd*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Bertot v. School District No. 1, Albany County, Wyoming*, 47 U.S.L.W. 2336 (10th Cir. November 15, 1978).

as to searches based solely on an arrest warrant has been clarified in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Steagald v. United States*, —— U.S. ——, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Our ruling is not to be construed in any way as intimating liability on the part of the City; that is a matter of proof under the applicable legal standards.

The case against Rose and Faherty is remanded for a new trial. The City of Boston shall be added as a defendant.

The case against Johnstone is remanded for a determination of damages which should be done as part of or in conjunction with the new trial.