**Ronnie HESLIP, Plaintiff,**

v.

**Ralph LOBBS and Joe Henning, Defendants.**

**No. LR–C–79–432.**

United States District Court, E.D. Arkansas, W.D.

Dec. 7, 1982.

R. David Lewis, Little Rock, Ark., for plaintiff.

Joe K. Hardin, Benton, Ark., for defendants.

### MEMORANDUM AND ORDER

EISELE, Chief Judge.

On October 2, 1979, the plaintiff filed a complaint against the defendants, Ralph Lobbs and Joe Henning, alleging that while acting under their authority as Benton, Arkansas, policemen the defendants had deprived the plaintiff of his constitutional rights. The plaintiff's claim, which was brought under 42 U.S.C. § 1983, arose out of his arrest and alleged beating and false imprisonment by the defendants on February 9, 1979. The action was tried to the Court on September 27, 1982. After hearing all the evidence, the Court made certain findings of fact and conclusions of law from the bench. This memorandum is intended to supplement those findings and conclusions. If there is any inconsistency or conflict, this memorandum shall control.

### I. *Findings of Fact*

On the night of the incident, the plaintiff was in the home of an acquaintance, Mrs. Midge Van Lone. Although Mrs. Van Lone had initially invited the plaintiff into her home, at some point she determined that the plaintiff had overstayed his welcome. She thereupon told her daughter to call the police to have him removed. The Court heard a considerable amount of evidence regarding the events leading up to the defendants' arrival at the Van Lone home. Much of the plaintiff's testimony conflicted with that of Mrs. Van Lone and her daughter; yet for purposes of the lawsuit, the Court finds that much of what happened between the plaintiff and Mrs. Van Lone and her daughter is irrelevant. The only issue is the propriety of the officers' actions in carrying out the arrest and incarceration of the plaintiff. Thus the Court has limited its consideration to facts that had a bearing on the defendants' alleged violation of the plaintiff's constitutional rights.

Mrs. Van Lone testified that the plaintiff had made advances to her and had brandished a gun, implying he might use it if Mrs. Van Lone gave him any trouble. In light of the limitation noted above, it is unnecessary for the Court to make any findings concerning these allegations about the plaintiff's behavior or whether the plaintiff had, in fact, made the threats attributed to him by Mrs. Van Lone.

It is relevant that both the plaintiff and Mrs. Van Lone testified that the plaintiff had been drinking alcohol before the defendants arrived at the home. The Court also finds that Mrs. Van Lone informed her daughter that she was afraid of the plaintiff. It also finds that Mrs. Van Lone asked her daughter to call the police and tell them that the plaintiff was in Mrs. Van Lone's home, that he had a gun, which he had threatened to use, and that Mrs. Van Lone was concerned for her safety and wanted him to leave. Mrs. Van Lone's daughter then called the police and relayed the information.

The most critical issues turn on what transpired *after* the defendants arrived at Mrs. Van Lone's home. In this connection, the Court essentially credits the testimony of the two defendants. It appears that defendant Officer Henning, and his partner, Officer Adams, responded to the call at approximately 12:30 a.m. While Officer Henning discussed the matter with Mrs. Van Lone and determined that the plaintiff was neither a member of the family nor a resident of the house, Officer Adams looked in the plaintiff's truck and found a loaded gun. Mrs. Van Lone reaffirmed her fear of the plaintiff and stressed that she wanted

him out of the house. Officers Henning and Adams then went to Mrs. Van Lone's bedroom where they found the plaintiff sleeping. The two officers, who were dressed in full uniform, awakened the plaintiff and identified themselves as police officers. The Court finds that the plaintiff knew they were officers of the law.

The officers told the plaintiff that Mrs. Van Lone had summoned them to her home and that she wanted him out of the house. At that point the plaintiff got dressed. He then asked whether the police had a warrant. They explained that they had no warrant, but were there in response to a call from Mrs. Van Lone. The two officers and the plaintiff then proceeded to Mrs. Van Lone's kitchen. About this time, defendant Officer Lobbs arrived with his partner, Officer Caldwell. Officers Lobbs and Caldwell had heard about the incident over their radio and had learned that a gun was involved. For approximately five or six minutes, the four officers discussed the situation with the plaintiff in the kitchen. They repeatedly stated that Mrs. Van Lone wanted the plaintiff out of her house.

From the time they first awakened the plaintiff, and particularly during this discussion in the kitchen, the officers observed the plaintiff's physical and verbal reactions and noted that his eyes were bloodshot and that he was unsteady on his feet. The officers also detected the scent of alcohol on the plaintiff's breath. From all of the facts and circumstances observed by them, the officers concluded that the plaintiff was intoxicated.

The officers were also aware of the icy weather conditions, which had rendered the roads quite hazardous that evening. They reasoned that under no circumstances would they permit the plaintiff to drive his vehicle in his condition.

At some point in the conversation, the plaintiff simply stated, "I am not going anywhere." Shortly thereafter, Officer Lobbs, who had learned the whereabouts of

the plaintiff's gun since his arrival, saw the plaintiff make a sudden "slashing" movement toward his boots. A short altercation ensued as Officers Lobbs, Adams and Henning grabbed the plaintiff, pushed him to the floor and handcuffed him. The officers charged the plaintiff with "public intoxication," a violation of Ark.Stat.Ann. § 41–2913 (1977 Repl.), and then transported him to the jail where he was turned over to the custody of officials at the jail. The plaintiff remained incarcerated for several hours. Officer Henning meanwhile had the plaintiff's truck towed from Mrs. Van Lone's property. The plaintiff asserted, and it was not disputed at trial, that he was acquitted of the "public intoxication" charge on the grounds that a bedroom was not a "public place" within the meaning of section 41–2913[1] of the Arkansas Statutes.

## II. *Memorandum of Law*

The plaintiff sought to establish at the outset of his arguments that he was entitled to relief because an arrest for public intoxication in a *private* house is illegal *per se*. The plaintiff reasoned that if the arrest were construed as illegal *per se,* then, regardless of his resistance, the officers would not be entitled to claim immunity from personal liability under 42 U.S.C. § 1983.

Obviously, each case must be evaluated on the merits of the facts adduced at trial. *Linn v. Garcia,* 531 F.2d 855, 861 (8th Cir. 1976); *Jackson v. Allen,* 376 F.Supp. 1393, 1395 (E.D.Ark.1974). Judging from the facts presented in the instant case, the plaintiff's legal argument is without merit.

At the outset, it should be noted that two Arkansas statutes relate to this case.

A person may not use physical force to resist an arrest by a person who is known, or reasonably appears to be (1) a law enforcement officer; ... whether the arrest is lawful or unlawful.

Ark.Stat.Ann. § 41–512 (Repl.1977).

A law enforcement officer is justified in using non-deadly physical force, or

---

**1.** The Benton Municipal Court records show no evidence that the case against the plaintiff (No. CR–79–787) ever proceeded to trial. Therefore,

it appears that the charge was simply dropped prior to trial on the ground cited.

threatening to use deadly physical force, upon another person when he reasonably believes it necessary: (a) to effect an arrest or to prevent the escape from custody of an arrested person unless the officer knows that the arrest is unlawful;
. . . .

Ark.Stat.Ann. § 41–510 (Repl.1977).

■ Section 41–512 is designed to ensure that law enforcement activities are conducted peacefully by discouraging violent responses to both legal and illegal arrests. While the rule prohibits an arrestee from resorting to self-help remedies, such as resisting or fleeing an arresting officer,[2] it does not foreclose legal remedies. After submitting peaceably to the arresting officers, an arrestee can normally file suit for any damages resulting from the arrest and attempt to invoke the remedies that section 1983 provides. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). To recover damages, the plaintiff must show that the defendants acted under color of state law and that they deprived him of his constitutional rights. *Giordano v. Lee,* 434 F.2d 1227, 1230 (8th Cir.1970) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970)).

#### A. *The Existence of Probable Cause*

The crux of the plaintiff's claim is that while acting in their capacity as Benton City policemen, the defendants improperly arrested and incarcerated him. Although the defendants clearly acted under color of state law, *see Monroe v. Pape,* 365 U.S. at 181–87, 81 S.Ct. at 480–84, it is far from clear that their actions rose to the level of a deprivation of constitutional rights.

■ As a preliminary matter, the Court realizes that an illegal arrest, or even a legal arrest in which excessive force is used, may give rise to a valid section 1983

claim. *See, e.g., Putman v. Gerloff,* 639 F.2d 415, 420–21 (8th Cir.1981); *Russ v. Ratliff,* 538 F.2d 799, 803–04 (8th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); *Clark v. Ziedonis,* 513 F.2d 79, 80 (7th Cir.1975). Nevertheless, police officers do not incur liability merely because a court subsequently acquits the arrestee of the particular charge cited by the officers. *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *Smith v. Gonzales,* 670 F.2d 522, 526 (5th Cir.1982). As the Court in *Pierson* reasoned, a policeman must not be forced to "choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U.S. at 555, 87 S.Ct. at 1218.

In this case, the defendants had no warrant when they arrested the plaintiff. The Court finds, however, that the officers did have probable cause to arrest him. As the defendants responded to Mrs. Van Lone's call for help, they were aware of two critical facts: that the plaintiff was on the premises without permission; and that he allegedly had threatened to use a gun on one or more of the residents. Upon their arrival, the defendants checked the validity of these facts. First, they corroborated the allegations in a conversation with Mrs. Van Lone, and then they looked for and found the plaintiff's loaded gun in his truck. Armed with this information, they proceeded to awaken and confront the plaintiff. They asked him to leave and he refused. During the discussion, they noticed that the plaintiff was inebriated. After several more minutes of conversation and the plaintiff's repeated refusals to leave, the officers arrested him and specifically charged him with public intoxication.

■ The Court must not don blinders in analyzing the circumstances present in the Van Lone home at the time of the arrest.

---

**2.** The Court acknowledges that in certain extreme cases a person might justifiably resist arrest. Such an occasion would likely arise only where such resistance is necessary to prevent death or immediate, substantial, irreparable, and potentially permanent mental or physi-

cal damage. *See Jackson,* 376 F.Supp. at 1395. Such an exception to the general rule emanates from the same policy choices that motivated the Arkansas legislature to enact section 41–512 and thereby restrict the use of force by the police.

It therefore considers the defendants' actions in light of the tense, confrontational atmosphere surrounding the incident. *See Glasson v. City of Louisville,* 518 F.2d 899, 908 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (urgent and stressful nature of the situation must be considered in determining the reasonableness of the police officer's actions). Officer Henning's principal objective in arresting the plaintiff was to remove the plaintiff from the premises and to place him where he could not harm Mrs. Van Lone or himself. When he arrested the plaintiff for "public intoxication," the officer honestly believed that the charge would fit the factual situation he had observed. *See Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 123 (D.C.Cir.1977) (charge cited by officer need not always be technically correct). Perhaps a charge of "criminal trespass" or "failure to obey a police officer's order" would have been more appropriate. In any event, the police had probable cause to arrest the plaintiff, notwithstanding the fact the plaintiff was not convicted of the public intoxication charge. *See Holmes v. State,* 262 Ark. 683, 561 S.W.2d 56, 57–58 (1978) (burglary suspect properly arrested for public intoxication).

The Court also finds that the defendants did not use excessive force in arresting the plaintiff, even after the plaintiff resisted arrest. Indeed, at the outset of the trial, the plaintiff withdrew any claim for damages arising out of the use of force during the arrest.

■ It also appears that the defendants had nothing to do with and no knowledge of the conditions of incarceration that the plaintiff allegedly experienced during the five or six hours that he was jailed. Therefore, they cannot be held liable under section 1983 for any damages that the plaintiff may have suffered during his incarceration. *See Watson v. Interstate Fire & Casualty Co.,* 611 F.2d 120, 123 (5th Cir. 1980), *quoted in Harris v. Pirch,* 677 F.2d 681, 685 (8th Cir.1982); *Hamrick v. Lewis,* 539 F.Supp. 1166, 1170–71 (N.D.Ill.1982). In addition, the Court finds that Officer

Henning's decision to impound the plaintiff's truck was reasonable under the circumstances. The officer did not want another altercation to develop, which he reasoned might occur if the plaintiff were released from custody and returned to the Van Lone home to get his vehicle.

**B.  *Qualified Immunity***

In spite of the foregoing discussion, there is an even more critical reason why the plaintiff's claim must fail. Courts have recognized that in section 1983 actions predicated on allegations of wrongful arrest, false imprisonment or excessive use of force, a police officer may be able to claim qualified immunity from liability. *See, e.g., Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Harris v. Pirch,* 677 F.2d 681, 686 (8th Cir.1982); *Landrum v. Moats,* 576 F.2d 1320, 1327 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978); *Bryan v. Jones,* 530 F.2d 1210, 1213–14 (5th Cir.), *cert. denied,* 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976). The touchstone of such a defense is good faith.

■ The "good faith" defense has traditionally involved a two-part inquiry. In order to recognize the defense, the trier of fact would have to find that the defendant both had a subjective belief as to the propriety of his actions, as well as some reasonable grounds for that belief. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). If either the subjective or the objective component is missing, then the defendant would not be immune from liability. *See Gomez v. Toledo,* 446 U.S. 635, 641, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980); *Scheur v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974); *Harris v. Pirch,* 677 F.2d at 686–87; *Landrum v. Moats,* 576 F.2d at 1327. In practical effect, a plaintiff could circumvent the good faith defense simply by alleging either that the defendant acted with malice *or* that the defendant's actions violated clearly established law. *Saldana v. Garza,* 684 F.2d 1159, 1163 n. 15 (5th Cir. 1982).

In the last year, however, many courts have re-formulated their interpretation of the good faith defense. They have narrowed their inquiry by jettisoning the subjective component of the previous test. As exemplified by the Fifth Circuit's opinion in *Saldana,* these courts have determined that "the good faith of official defendants is now to be tested purely by an 'objective' standard . . . ." *Id.* at 1163–64 n. 15. *Accord Crowder v. Lash,* 687 F.2d 996, 1007 (7th Cir.1982); *Peltac v. Borough of Manville,* 547 F.Supp. 770, 776 (D.N.J.1982) ("*Harlow* adjusted the traditional good faith immunity defense by reducing it to just an 'objective component.' "); *Nakao v. Rushen,* 545 F.Supp. 1091, 1092 (N.D.Calif. 1982); *Standridge v. City of Seaside,* 545 F.Supp. 1195, 1198 (N.D.Calif.1982); *Thompson v. Pennsylvania Parole Board Member Jefferson,* 544 F.Supp. 173, 175 n. 3 (E.D.Pa.1982); *Calloway v. Fauver,* 544 F.Supp. 584, 607 (D.N.J.1982); *Irshad v. Spann,* 543 F.Supp. 922, 929 (E.D.Va.1982) (dictum); *Piccollela v. Rieck,* 555 F.Supp. 27 (S.D.N.Y.1982); *Visser v. Magnarelli,* 542 F.Supp. 1331, 1337 (N.D.N.Y.1982).

These courts' rejection of the subjective component stems from their reading of the Supreme Court's recent opinion in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It appears, however, that they may have somewhat skewed the Supreme Court's ruling.

### 1. *The Harlow Opinion*

In *Harlow,* the plaintiff alleged that certain government officials, including several senior White House aides, had conspired to deprive him of his constitutional and statutory rights. The defendants claimed, *inter alia,* that they were shielded from liability by the "good faith"-qualified immunity defense. Rather than pass on the defendants' qualified immunity claim, the Supreme Court reshaped the contours of the quali-

fied immunity standard, and remanded the case to the Court of Appeals.[3]

In numerous cases, cited *supra,* courts have drawn upon *Harlow* to find that the subjective element of the good faith defense no longer exists. Although the *Harlow* opinion is not a model of clarity, this Court interprets the opinion in a slightly different manner. Rather than completely foreclosing an inquiry into the defendant's subjective belief, *Harlow* simply establishes a multi-step formula. Only at the threshold stage—during which a court must determine whether the applicable law was "unsettled" at the time of the incident—must a court ignore evidence of the official's subjective beliefs.

To understand the Supreme Court's limitation on the good faith defense, one must be cognizant of the problems generated by previous interpretations of the good faith defense. As noted in *Harlow,* the good faith defense represents a balancing of several inconsistent social goals. On the one hand, the Supreme Court recognized that "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Id.* 102 S.Ct. at 2734–35. Thus, remedies must exist both to ensure compensation and to deter improper actions by officials. *See generally,* Newman, *Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct,* 87 Yale L.J. 447, 459–62 (1978). On the other hand, the Court expressed concern about the frequency of suits against innocent public officials.[4] Such suits impose heavy social costs, including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* 102 S.Ct. at 2736. The Court also noted that an expansive view toward imposing liability on public officials tends to discour-

---

**3.** Although *Harlow* arose in context of a civil action brought under the Constitution, the Supreme Court stated that it would apply to all section 1983 actions that involve the good faith defense. 102 S.Ct. at 2738–39 n. 30.

**4.** For a discussion of the tremendous increase in the number of suits brought against police officers during the past fifteen years, see Littlejohn, *Civil Liability and the Police Officer: The Need for New Deterrents to Police Misconduct,* 58 U.Det.J.Urb.L. 365, 370–71 (1981).

age officials from legitimately executing their duties in a vigorous and "unflinching" manner. *Id. See also* Schuck, *Suing Our Servants: The Court, Congress and the Liability of Public Officials for Damages,* 1980 Sup.Ct.Rev. 281, 285, 311–15. In essence, the qualified immunity defense attempts to accommodate these competing social goals.

The *Harlow* opinion suggests that evolving standards for qualified immunity had rendered the defense negligible in effect. For although innocent officials could ultimately elude liability, they were nevertheless adversely affected by the many costs imposed by litigation. *See* 102 S.Ct. at 2738, 2739 n. 35. The Court identified the subjective component of the good faith standard as the real culprit, finding that a policy of inquiring into subjective belief for all cases had "proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial." *Id.* 102 S.Ct. at 2737 (citing *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). As the Court concluded, "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." 102 S.Ct. at 2738.

### 2. *The Harlow Two-part Test*

The remedy envisioned by the Supreme Court is simple. In order to circumvent spurious suits, a court should initiate a threshold inquiry: whether the applicable law that the defendant purportedly violated was "clearly established" at the time of the incident. *Id.* 102 S.Ct. at 2739. If the law is found to be *not* clearly established, *see,* e.g., *Albers v. Whitley,* 546 F.Supp. 726, 737 (D.Or.1982), the defendant would be entitled to summary judgment. *Id.* The key to the Supreme Court's remedy is the fact that at this threshold stage, the court grapples with a question of law, not a question of fact. An inquiry into such matters as subjective beliefs and any concomitant discovery is therefore irrelevant at this stage. In practical effect, the Supreme Court's suggested procedure enables a defendant to raise the unsettled nature of the law as a shield to liability, and thereby quickly dispose of suits without being subjected to the rigors and costs of extended discovery or of a trial. *See Gray v. Bell,* 542 F.Supp. 927, 931 n. 5 (D.D.C.1982); *King v. Wells,* 94 F.R.D. 675, 686–87 n. 10 (E.D.Mich.1982).

While the threshold test may eliminate numerous cases in their incipient stages, courts may, and probably will, frequently find that the law pertaining to a particular incident is "clearly established." *See, e.g., Visser v. Magnarelli,* 542 F.Supp. 1331, 1337–38 (N.D.N.Y.1982). Under these circumstances, the court must proceed to the second phase of inquiry. At this stage, if the official seeking to invoke the good faith defense "can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." 102 S.Ct. at 2739.[5]

It is apparent to this Court that *Harlow* does not foreclose an inquiry into subjective evidence during this second phase. Indeed, the opinion clearly allows a court at this juncture to evaluate the defendant's subjective beliefs in addition to objective factors.[6]

---

**5.** This Court infers from the *Harlow* opinion that, at this point, the burden of persuasion rests with the defendant to establish that "he neither knew nor should have known" that his acts violated the plaintiff's rights. Placing the burden on the defendant is consistent with the good faith defense's status as an "affirmative defense." *See* 102 S.Ct. at 2737. *See also DeVasto v. Faherty,* 658 F.2d 859, 865 (1st Cir.1981); *Landrum,* 576 F.2d at 1329. It also follows the general rule of placing the burden on the party having the better access to knowledge about the fact in question. *See* F. James & G. Hazard, *Civil Procedure,* § 7.8 at 251–52 (2d ed. 1977). Finally, as one commentator has noted:

Allocating the burden of proof to defendants is also appropriate because of the legal posture from which qualified immunity is usually asserted. An affirmative defense such as qualified immunity does not address the question of wrongdoing, but rather seeks a dispensation because of special circumstances, regardless of fault.

Note, *Qualified Immunity for Public Officials Under Section 1983 in the Fifth Circuit,* 60 Tex.L.Rev. 127, 143 (1981).

**6.** The Court's "knew or should have known" language, 102 S.Ct. at 2739, contains both subjective and objective elements. *See id.* 102 S.Ct. at 2740 (Brennan, J., concurring); Nah-

701

Therefore, if the court has determined that the law was "clearly established" at the time of the incident, then the defendant must prove two facts: first, that he was not aware of such law and therefore of the impropriety of his actions; and, second, that the average person in his situation (usually an officer of the law) would not have known of such law and, therefore, that such actions were wrong. If the defendant fails to establish either of these facts, his purported good faith defense must fail.[7]

### 3. Application of the Harlow Two-part Test

■ Applying these rules to the case at bar, the Court finds that the defendants are entitled to qualified immunity under the good faith defense. The plaintiff attempted to argue at trial that the defendants' actions were unjustified because they arrested the plaintiff for "public intoxication" in a private residence. Ark.Stat.Ann. § 41–2913 provides in pertinent part:

(1) A person commits the offense of public intoxication if he appears in a *public place* manifestly under the influence of alcohol ... to the degree and under circumstances such that he is likely to endanger himself or other persons or property, or that he unreasonably annoys persons in his vicinity.

(Emphasis added.) This Court is aware of only one Arkansas decision that has construed the meaning of the term "public place" in connection with a public intoxica-

tion offense.[8] In *Berry v. City of Springdale*, 238 Ark. 328, 381 S.W.2d 745 (1964), the Arkansas Supreme Court interpreted the term "public place," as contained in the state's previous public intoxication statute, Ark.Stat.Ann. § 48–943 (Repl.1964). The court adopted a rather expansive construction of the term to find that the appellant's vehicle, which was sitting stationary some ten to twenty-five feet from a public highway, was a "public place." 238 Ark. at 330, 381 S.W.2d 745.

Unfortunately, this decision gives little insight into the case at bar. In fact, only the official Commentary to section 41–2913 is instructive regarding the issue: "A 'public place' would include a private club, but would not go so far as a recently superseded Texas statute punishing drunkenness 'at any private home except [the actor's] own.'"

Due to the dearth of decisional authority pertaining to the issue, the Court does not find that the law was "well established" when the defendants arrested the plaintiff. Thus, the Court need not delve into the second phase of the *Harlow* test.

■ Even if the Court were to determine that the law was, in fact, settled, it would still find that the defendants are entitled to qualified immunity. From the facts presented at trial, the Court has found that the defendants did not know, nor

---

mod, *Constitutional Accountability in Section 1983 Litigation*, 68 Iowa L.Rev. 1, 7–8 n. 53 (1982) ("There may still be situations in which the defendant official's subjective state of mind, i.e., what he or she actually knew, is relevant ...."). And while the Supreme Court stressed that the good faith defense should turn "*primarily* on objective factors," 102 S.Ct. at 2739 (emphasis added), still it is clear that in some situations inquiry into the defendant's subjective state of mind may be critical to that defense. Indeed, as Justice Brennan noted in his concurrence, the *Harlow* rule was designed to prevent those who knew the impropriety of their acts from avoiding liability. *Id.* 102 S.Ct. at 2740. ("[T]he clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes.") If subjective evidence were deemed inadmissible, then certain malicious officers, who actually knew the settled law and, ergo, the unlawful-

ness of their actions, might unjustifiably avoid liability. All they would have to show is that the *average* officer would not have known the settled law at the time.

7. To emphasize once more, the innovative facet of *Harlow* is that the defendant will *not* have to prove, or even raise, the good faith defense unless the court has found that the relevant law was clearly established when the incident occurred.

8. One other Arkansas decision has addressed the meaning of the term in connection with laws condemning sexually indecent behavior. *See State v. Black*, 260 Ark. 864, 545 S.W.2d 617 (1977) (interpreting Ark.Stat.Ann. § 41–1811 (1976) to find jail's "drunk tank" is a public place).

should they have known, that the arrest violated established law. *See Saldana v. Garza,* 684 F.2d at 1165 & n. 20 (even assuming that plaintiff's arrest for public intoxication occurred while he stood in his front yard, the officers were still entitled to the good faith defense). The defendants acted reasonably under the circumstances, and there is absolutely no evidence that they knew that their actions were improper or that they otherwise acted with malicious motives. *See id.* at 1165 n. 20.

Therefore, it is Ordered that the complaint be, and it is hereby, dismissed.